**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:23-cv-00112-MR-WCM**

| | | |
|---|---|---|
| **WILLIAM ZIEGLER** | ) | |
| and **VICKI ZIEGLER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF**</u> |
| | ) | <u>**DECISION AND ORDER**</u> |
| **POLARIS INDUSTRIES, INC.** | ) | |
| and **ERIC KIPP,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the following motions:

(1) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Jerry Bauer [Doc. 109];

(2) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Stan V. Smith [Doc. 113];

(3) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Garrett Wood [Doc. 116];

(4) Plaintiffs' Motion in Limine to Bar Mission Hospital Toxicology Results [Doc. 119];

(5) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. David Bosch [Doc. 121];

(6) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Robert E. Burnham [Doc. 124];

(7) Plaintiffs' Motion in Limine to Bar Tackett Testimony as Amended [Doc. 120, as corrected, Doc. 127]; and

(8) Plaintiffs' Motion in Limine to Bar Warner Testimony as Amended [Doc. 114, as corrected, Doc. 128].

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On November 28, 2019, William and Vicki Ziegler ("Plaintiffs") were visiting Eric Kipp ("Kipp"), Vicki's brother. [Doc. 102-11: W. Ziegler Dep. at 10, 30, 32]. After midnight, Kipp suggested that he and Mr. Ziegler go for a ride on Kipp's Polaris Ranger, a utility task vehicle ("UTV"). [Id. at 33, 38]. Both had been drinking. [Id. at 33-34, 78-79]. During the ride, the UTV crashed into a creek, causing its rollover protective structure ("ROPS") to deform. [Id. at 40, 45, 83]. At the time of the crash, Kipp was driving, and Mr. Ziegler was riding in the passenger seat. [Id. at 40, 45]. As a result of the crash, Mr. Zeigler suffered substantial injuries. [Id. at 6, 44, 50]. Both Mr. Ziegler and Kipp were transported to Mission Hospital, where tests were conducted to determine their blood alcohol content ("BAC"). [Docs. 101-2: Schweinler Dep. at 34-35; 97-3: Mr. Ziegler Toxicology Results; 97-4: Kipp Toxicology Results].

On November 10, 2021, Plaintiffs initiated this action by filing their Complaint[1] against Polaris Industries, Inc. ("Polaris"), and Kipp.[2] [Doc. 1]. Plaintiffs allege claims against Polaris for strict liability design defect, negligence, and loss of consortium, contending that Mr. Ziegler was injured because the UTV's ROPS deformed during the crash. [Id.]. Polaris raises several affirmative defenses, including that Mr. Ziegler's actions contributed to his injuries. [See Doc. 12 at 16-17]. Plaintiffs and Polaris have both retained expert witnesses in this matter, and each party now moves to exclude some of the other's proposed expert testimony. [See Docs. 109, 113, 114, 116, 120, 121, 124, 127, 128]. Plaintiffs also move to exclude the toxicology test results from Mission Hospital. [See Doc. 119]. The parties have responded in opposition, [see Docs. 135, 137, 138, 139, 143, 144, 146, 147, 148], and filed replies [see Docs. 149, 150, 151, 152, 153, 154, 155, 156, 157]. As such, these motions are ripe for disposition.

## II.   STANDARD OF REVIEW

---

[1] This matter was initially filed in the United States District Court for the Western District of Michigan. [See Doc. 1]. However, on April 24, 2023, that court granted Polaris's motion to transfer venue, and this matter was transferred here the next day. [See Docs. 67-68].

[2] On May 27, 2022, Plaintiffs' claims against Kipp were dismissed with prejudice, and he was terminated as a defendant. [See Doc. 30].

State law controls the substantive tort issues in this matter, as it is pending in federal court pursuant to diversity jurisdiction. See Bryte *ex rel.* Bryte v. Am. Household, Inc., 429 F.3d 469, 476 (4th Cir. 2005). However, federal law governs the admissibility of evidence. Id. Rule 702[3] of the Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under Rule 702, trial judges are to serve "as 'gatekeepers of expert testimony' to protect the judicial process from the 'potential pitfalls of junk science.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 275 (4th Cir. 2021) (quoting United States v. Bonner, 648 F.3d 209, 215 (4th Cir. 2011)). In fulfilling this gatekeeping function, a trial court must "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at

---

[3] Rule 702 was amended on December 1, 2023. 344 F.R.D. 850. The amended version is to "govern in all proceedings . . . commenced [after December 1, 2023,] and, insofar as just and practicable, all proceedings then pending." Id. Accordingly, the Court will apply the amended version of Rule 702 here.

hand." Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).

Regarding scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is applied properly to the facts at issue. Daubert, 509 U.S. at 589. The Court has broad discretion in making this determination. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). However, there are several key factors that should be considered, including whether the expert opinion can be tested; whether it has been subjected to peer review; the error rate of the methods that the expert employed; the existence and maintenance of standards used in the expert's methods; and whether the expert's methods are generally accepted in the scientific community. Daubert, 509 U.S. at 592-94; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005). In weighing these factors, the Court is guided by the following, somewhat competing, principles:

> On the one hand, the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. And the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. On the other hand, the court must recognize

> that due to the difficulty of evaluating their testimony,
> expert witnesses have the potential to be both
> powerful and quite misleading. And given the
> potential persuasiveness of expert testimony,
> proffered evidence that has a greater potential to
> mislead than to enlighten should be excluded.

Smith v. Wyeth-Ayerst Lab'ys Co., 278 F. Supp. 2d 684, 690 (W.D.N.C. 2003) (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)) (internal citations and quotation marks omitted).

## III. DISCUSSION

### A. Polaris's Motion to Exclude Testimony of Dr. Jerry Bauer

Polaris seeks to exclude what it characterizes as Dr. Bauer's opinions relating to "how Mr. Ziegler's injuries occurred and what part of the vehicle Mr. Ziegler came into contact with during the crash." [Doc. 110 at 1-2].

A witness may only provide expert opinion testimony to the extent his testimony is based upon his knowledge, skill, experience, training, and education. See Fed. R. Evid. 702. An expert, therefore, may not offer opinion testimony outside of his area of expertise. See Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997); Steele v. Kenner, 129 F. App'x 777, 781 (4th Cir. 2005); see also In re Pella Corp., 214 F. Supp. 3d 478, 496 (D.S.C. 2016). Additionally, experts may not offer opinion testimony "based on assumptions which are speculative and are not

supported by the record."  Tyger Constr. Co. v. Pensacola Constr. Co., 29

F.3d 137, 142 (4th Cir. 1994); Am. Household, Inc., 429 F.3d at 477.

Polaris concedes that Dr. Bauer qualifies as an expert in neurology,

and it does not seek to exclude the opinions in his report related to the nature

and extent of the injuries Mr. Ziegler suffered during the crash.  [See Docs.

111; 150 at 1].  It argues, instead, that "during his deposition, Dr. Bauer went

beyond th[ese] opinion[s] and purported to testify as to *how* Mr. Ziegler

suffered these injuries."  [Doc. 110 at 3-4].  Polaris specifically argues that

Dr. Bauer's following answers to its questions are beyond the scope of his

qualifications:

> Q.    Do you have an opinion regarding what caused
> Mr. Ziegler's scalp laceration and skull fracture?
>
> A.    Yes.
>
> Q.    And what is that opinion?
>
> A.    A direct blow to that area.
>
> Q.    Do you have an opinion regarding what it was
> that contacted Mr. Ziegler's head in that area?
>
> A.    I have guesses, but I don't have an absolute
> hundred percent opinion . . . .
>
> Q.    Is it your opinion as a medical doctor that to [a]
> medical degree of -- to a reasonable degree of
> medical certainty, that Mr. Ziegler's injuries were
> caused by the ROPS of the vehicle crushing him?

A.      Again, I'm not a reconstruction specialist. I've never seen a UTV. But if you -- so I can testify about the injuries to the skull and to the cervical spine. But by glancing at the pictures, I would have guessed -- just by glancing at the pictures, without having special expertise in this, I would have guessed it was the roof that, to me, was slanted down on the right side that caused the injury . . . .

Q.      But you do believe, having looked at the pictures, that the upper right corner of the ROPS is what caused Mr. Ziegler's injuries?

A.      Well, I didn't say upper right corner. So what I think -- and, again, **it's pure speculation** -- by looking at the picture, it looks to me like the roof on the right side came down and hit Mr. Ziegler on the left side of the head and pushed his head forward.

[Id. at 7; Doc. 110-2 at 51:17-52:1, 67:3-16, 68:10-22 (emphasis added)].

To the extent that Dr. Bauer's responses to these questions were intended to be expert opinions, they are clearly speculative and therefore inadmissible. Indeed, when Polaris asked Dr. Bauer if he had "an opinion regarding what . . . contacted Mr. Ziegler's head," Dr. Bauer responded, "I have guesses, but I don't have an absolute . . . opinion." [Doc. 110-2 at 51:23-52:1]. Similarly, when Dr. Bauer was asked if it was his opinion to a reasonable degree of medical certainty that Mr. Ziegler had been injured by the UTV's deformed ROPS, Dr. Bauer indicated that he could only "guess" and "speculate" as to the cause of Mr. Ziegler's injuries. [See id. at 67:3-

68:22]. Given his obvious lack of any foundation or basis, and even lack of a true opinion, Dr. Bauer will not be allowed to "guess" and "speculate" that the UTV's deformed ROPS caused Mr. Ziegler's injuries at trial. See Tyger Constr. Co., 29 F.3d at 142.

Polaris also argues more generally that Dr. Bauer is unqualified to offer *any* testimony about the cause of Mr. Ziegler's injuries, as he does not have expertise in biomechanics, kinematics, or accident reconstruction. [See Doc. 110 at 6, 8]. However, expert physicians may testify upon a proper foundation that injuries related to their expertise are consistent with certain causes. See Fitzgerald v. Manning, 679 F.2d 341, 351 n.9 (4th Cir. 1982); see also Zellers v. NexTech Ne., LLC, 533 F. App'x 192, 197 (4th Cir. 2013); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). Here, Mr. Ziegler sustained extensive injuries to his spine and brain, and Polaris concedes that Dr. Bauer is qualified to testify as an expert neurologist. Accordingly, Dr. Bauer may testify regarding the nature and extent of Mr. Ziegler's injuries and to whether Mr. Ziegler's cervical spine injuries are generally consistent with what sort of impact to what part of his body. However, he may not proffer an opinion as to specifically how Mr. Ziegler's injuries occurred, or as to what part of the UTV Mr. Ziegler may have contacted during the crash.

For these reasons, Polaris's motion to exclude portions of Dr. Bauer's testimony is granted in part and denied in part.

## B. Polaris's Motion to Exclude Testimony of Dr. Stan Smith

Polaris moves to exclude Dr. Smith's testimony regarding his opinions as to the reduction in value of Mr. Ziegler's life and Mrs. Ziegler's loss of society, arguing that Dr. Smith's testimony, and particularly his methodology, does not meet the requirements of Rule 702. [See Doc. 115 at 4-5, 7].

Dr. Smith's methodology for estimating Mr. Ziegler's "reduction in value of life" is as follows.[4] [Doc. 144-1 at 11 of 23].[5] Dr. Smith's first step is to estimate "the value[] of a statistical life," which appears to be a statistical assessment of the value of a life of some average human. [See id. at 12 of 23]. Dr. Smith explains that several "principal systematic reviews (meta-analyses)" have "combined" the results of individual studies estimating this value in making their own estimates.[6] [Id. at 20 of 23]. Dr. Smith reaches

---

[4] Dr. Smith uses the terms "value of enjoyment of life," "loss of enjoyment of life," "value of life," and "value of a statistical life," on what appears to be an interchangeable basis. However, he does not define these terms, nor explain why he views them as interchangeable. [See, e.g., Doc. 144-1 at 11-12, 23 of 23].

[5] Both Dr. Smith's report and deposition are contained in the same electronic filing. As such, citations to [Doc. 144-1] specifically indicate whether such citation is to his report or to his deposition.

[6] It is entirely unclear what, if any, parameters were employed by the authors of these reviews. For instance, Dr. Smith has provided no indication that variables such as race, sex, socioeconomic status, nationality, etc., were properly accounted for.

10

his figure by averaging the estimates of five of these principal reviews. [Id. at 20-21 of 23, Dep. at 38:4-11]. As his second step, Dr. Smith reduces his estimate by "human capital," which he defines as the value of an individual's wages and household services. [Id. at 20 of 23, Dep. at 41:12-43:21]. Dr. Smith then further reduces his estimate by a 24 percent "conservatism factor," as his third step. [Id.]. As his fourth step, although he does not state that he does so, Dr. Smith apparently discounts the resulting figure to "present value." [See id. at Tables 18-23]. Finally, as his fifth and final step, Dr. Smith multiplies his discounted figure by 50 and 90 percent, Mr. Ziegler's estimate of his own percentage of impairment. [Id. at 12 of 23, Dep. at 28:14-29:21]. Dr. Smith then opines that the value of Mr. Ziegler's "loss of enjoyment of life" is between the two resulting numbers. [Id. at 12, 23 of 23].

As a primary matter, Dr. Smith's methodology for calculating the value of an individual's "loss of enjoyment of life" has been routinely rejected as unhelpful and unreliable for three decades.[7] See, e.g., Smith v. Jenkins, 732 F.3d 51, 66 (1st Cir. 2013); Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1245 (10th Cir. 2000) ("Attempts to quantify the value of human life have met considerable criticism in the literature of economics as well as in the federal court system. Troubled by the disparity of results reached in published

_____

[7] Enjoyment of life damages are often referred to as hedonic damages.

value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of Daubert have unanimously held quantifications of such damages inadmissible."); Mercado v. Ahmed, 974 F.2d 863, 871 (7th Cir. 1992) ("The district court [correctly] ruled that, despite Smith's training, extensive research and countless calculations, his testimony would not aid the jury in evaluating the evidence and arriving at its verdict (the true test of expert testimony under Fed. R. Evid. 702) because Smith was no more expert in valuing life than the average person."); see also Balan v. Vestcor Fund XXII, Ltd., No. 3:19-cv-351-MMH-JBT, 2021 WL 2138876, at *1 n.1 (M.D. Fla. May 26, 2021) (collecting over 20 cases decided between 1992 and 2020 excluding Dr. Smith's testimony as unreliable or unhelpful, or both); Snyder v. Bank of Am., N.A., No. 15-cv-042280-KAW, 2020 WL 6462400, at *9 (N.D. Cal. Nov. 3, 2020) ("While Dr. Smith equated the value of life with the value of enjoyment of life . . . it is readily apparent that the two are not the same.") (internal citations and quotation marks omitted); Santiago v. Fischer, No. 09-CV-1383 (MKB), 2020 WL 9816014, at *5 (E.D.N.Y. Sept. 4, 2020) ("[T]he Court finds that Plaintiff has not established the reliability of Dr. Smith's methodology for demonstrating the particular damages at issue

here—loss of enjoyment of life damages—and finds that Dr. Smith's expert testimony as to a specific damages amount will not be helpful to the jury.").

An analysis of the individual steps that Dr. Smith uses to reach his opinion in this case underscores why his methodology has been so consistently rejected. As his first step, Dr. Smith estimates "the value of a statistical life." As noted above, he does this by averaging the results of reviews that base their own estimates on "peer-reviewed" studies that have estimated this value by considering (1) consumer behavior, e.g., how much someone might pay for protective measures, such as smoke detectors; (2) wage risk premiums to workers, i.e., how much additional compensation workers receive for performing dangerous jobs; and (3) cost-benefit analyses of government regulations, e.g., comparing the benefits and costs of smokestack scrubbers at coal power plants. [See Doc. 144-1 at 12 of 23]. These studies, however, do not "reliably measure the value of life." Santiago, 2020 WL 9816014, at *5 (citing Crawford v. Franklin Credit Mgmt. Corp., No. 08-CV-6293, 2015 WL 13703301, at *8 (S.D.N.Y. Jan. 22, 2015) (collecting cases)); Mercado, 974 F.2d at 871 ("[W]e have serious doubts about [Smith's] assertion that the studies he relies upon actually measure how much Americans value life."); Smith, 732 F.3d at 66 ("[W]e have serious doubts that the underlying studies actually measure the value of life."). Nor

do their estimates of the *total value* of life have any relation to the component of damages at issue here, the *enjoyment* of life.  See Mercado, 974 F.2d at 871; Smith, 732 F.3d at 67 (Smith's "studies do not relate in any way to the actual component of damages, the enjoyment of life."); Snyder, 2020 WL 6462400, at \*9; Santiago, 2020 WL 9816014, at \*5.[8]

Additionally, even if the results of these studies were reliable and relevant, Dr. Smith does not explain how he is able to reach an exact estimate of the value of the statistically average life—5.9 million in 2005 dollars—by averaging the estimates of five reviews where those estimates were only expressed in terms of broad ranges.  Indeed, when examined together, the reviews state that the correct figure could be anywhere between 2.86 million and 9.6 million in 2005 dollars, a  more than three-fold variance. [Doc. 144-1 at 21 of 23].  Moreover, one review itself indicates that its estimate could vary from the correct value by as much as 44 percent.  [Id.]. Dr. Smith's estimate of 5.9 million dollars, the average of the reviews' estimates, amounts to nothing more than "eyeballing," and "surely lacks

_____

[8] Dr. Smith provides almost no information regarding the five reviews he uses to reach his estimate of the value of the statistically average life.  For instance, he does not state the areas of expertise and the qualifications of the reviewers, the facts or data they relied upon, nor the methodologies they used to analyze data from the studies each review combined.  Even if the studies' results were relevant and reliable, Plaintiffs would have needed to provide this basic information about the reviews to demonstrate that Dr. Smith's testimony meets the requirements of Rule 702.

scientific reliability in the sense of producing consistent results. Anyone can look at the same range and come up with a different figure." Ayers v. Robinson, 887 F. Supp. 1049, 1060 (N.D. Ill. 1995). For these reasons, Plaintiffs have failed to demonstrate both that Dr. Smith's testimony would be helpful, and that it is based on reliable principles and methods. See Fed. R. Evid. 702(a) & (c). Further, because Plaintiffs have not established the reliability of the studies and thereby the reviews—which are the sole basis for Dr. Smith's estimate of the value of the statistical life—Plaintiffs have also failed to demonstrate that Dr. Smith's estimate is based on sufficient facts or data. See id. at 702(b). Moreover, as the remaining portions of Dr. Smith's methodology build upon his unscientific guesswork at step one, they are necessarily equally unreliable and irrelevant.

While these grounds are sufficient for exclusion, all the other "principal parts of [Dr.] Smith's proposed testimony on the issue of hedonic damages are inadmissible" and are equally flawed in other respects. Ayers, 887 F. Supp. at 1064. For instance, there are at least three problems with Dr. Smith's second step, his reduction for "human capital." [Doc. 144-1 at 20 of 23; Dep. at 41:12-43:21]. First, Dr. Smith does not explain why he makes this reduction. It *appears* he believes that by subtracting human capital— the economic component of the value of one's life—from the total value of

one's life, that the resulting "noneconomic leftover must be the value of enjoyment of life." Stokes v. John Deere Seeding Grp., No. 4:12-cv-04054-SLD-JAG, 2014 WL 675820, *5 (C.D. Ill. Feb. 21, 2014). However, Dr. Smith provides "no basis, scientific or otherwise, for asserting that the only components of life's value are economic productivity and enjoyment." Id. Indeed, his logic is entirely "illusory." Id.

Second, applying Dr. Smith's logic, individuals working minimum wage jobs, or those who are unemployed, *necessarily* must enjoy their lives more than well-paid entrepreneurs or professionals. For instance, Dr. Smith deducts the value of an individual's human capital—which he defines as the value of one's wages and household services—from his *fixed* estimate of the "value of a statistical life." [Doc. 144-1 at 20 of 23; Dep. at 41:12-43:21]. Thus, because unemployed individuals receive a much smaller deduction from the "value of a statistical life" for their "human capital," as they earn less in wages, they necessarily must enjoy their lives at a proportionally greater rate than those receiving more in compensation. The truth of this is plainly doubtful. However, at minimum, neither Plaintiffs, nor Dr. Smith, have provided *any* evidence supporting this "logic."

Third, even assuming Dr. Smith's logic were sound, he does not state in his report that he reduced his estimate of the "value of the statistical life"

by the *actual* value of Mr. Ziegler's human capital. Rather, it appears that Dr. Smith deducted a constant for human capital, which he based on "literature reviews." [See id. at 20 of 23]. This is plainly inconsistent with Dr. Smith's own definition of human capital, as individuals hold a wide array of different jobs, receive vastly different wages for their work, and provide countless different services to their households. Underscoring this, when Dr. Smith's estimates of Mr. Ziegler's wages and household services are subtracted from Dr. Smith's estimate of the "value of the statistical life," the result is a negative number, rather than the 4.8 million dollar figure that Dr. Smith states is a "credible . . . value" "net of human capital" based on "literature reviews." [Id. at 20 of 23]. Put differently, using Dr. Smith's logic, when the economic components of Mr. Ziegler's life are subtracted from the "value of the statistical life," Mr. Ziegler had a net-negative "value of enjoyment of life." Moreover, because Dr. Smith does not include *any* step-by-step calculations in his report, it is *impossible* to reconcile these discrepancies.

As his third step, Dr. Smith reduces his figure by a 24 percent "conservatism factor." [Id. Dep. at 42:18-43:5]. However, he offers no scientific or scholarly basis for applying such a factor. Rather, Dr. Smith explains that he makes this reduction because "[he] like[s] to be able to tell

a jury that if they use the numbers that [he] provide[s] them, they are providing a conservative estimate.  So it's just for that reason."  [Id.].  Moreover, when asked why he uses 24 percent, as opposed to 22 or 23 percent, Dr. Smith offered no explanation or method for calculating the conservatism factor.  Instead, he responded, "It's just simply what I do.  Do you want to make another suggestion off the record sometime?  I can take it under advisement."  [Id. Dep. at 43:22-44:3].  That Dr. Smith offered no explanation or method for calculating the 24 percent conservatism factor, and even agreed that the figure was arbitrary and could be easily adjusted, "leav[es] the Court with no option but to conclude that the conservative value is derived through unmethodical, subjective 'eyeballing.'"  Stokes, 2014 WL 675820, at *4 (quoting Ayers, 887 F. Supp. at 1060).

After these deductions, Dr. Smith *apparently* discounts the resulting amount to present value, as his fourth step, based on an assumption that the individual will live to a statistically average age.  [See Doc. 144-1 at Tables 18-23].  Dr. Smith does not acknowledge performing this discounting in his report.  However, he includes several tables tending to demonstrate that he did so.  [Id.].  Dr. Smith's failure to mention that he conducted this discounting, and to explain why he did so, gives the impression that these tables were included merely "to give the illusion of forensically precise

calculations in [a] specific case." See Fams. Advoc., LLC v. Sanford Clinic N., No. 3:16-CV-00114, 2019 WL 1442162, at *5 (D.N.D. Mar. 31, 2019). For all of these reasons, Plaintiffs have not demonstrated that Dr. Smith's testimony regarding the "reduction in value" of Mr. Ziegler's life meets any of the requirements set forth in Rule 702. Accordingly, it will be excluded.

Turning to Dr. Smith's calculation of Mrs. Ziegler's loss of society damages, Dr. Smith states that he estimates this amount to be $2,025,486, and that this figure is "[b]ased on a benchmark loss of 35 percent[.]" [Doc. 144-1 at 13 of 23]. Dr. Smith never explains, however, how he used this "benchmark" to calculate the value of Mrs. Ziegler's loss of society. Presumably, he multiplied some component of Mr. Ziegler's damages by 35 percent, but he does not explain how the value of one individual's loss of society can be reliably estimated as a fraction of another's damages. See Fams. Advoc., LLC, 2019 WL 1442162, at *5-*7 (quoting Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997)) (excluding Dr. Smith's loss of society testimony because his calculations are "arbitrary," "unrelated to the facts of this case," and "'so fundamentally unsupported that [they] can offer no assistance to the jury.'").

Additionally, when asked why he selected a 35 percent benchmark, Dr. Smith stated that he arrived at this figure because Mr. Ziegler said in an

interview that he believed Mrs. Ziegler's quality of life had been reduced by half or more because of his injuries. [Doc. 144-1 Dep. at 47:3-14]. However, Dr. Smith stated that 35 percent was just used "as an example[,]" and that **it is not his opinion** "that the loss of society or relationship that Mrs. Ziegler sustained is 35 percent[.]" [Id. Dep. at 47:10-21]. This sort of arbitrary sample calculation will not assist the trier of fact, is not based on Dr. Smith's expertise in economics, is not based on *any* facts or data, and is not the product of reliable principles and methods. See Fed. R. Evid. 702(a)-(c). For these reasons, Dr. Smith's loss of society testimony will be excluded.

In sum, Polaris's motion to exclude Dr. Smith's testimony regarding Mr. Ziegler's "reduction in value of life" and Mrs. Ziegler's loss of society is granted.

## C. Polaris's Motion to Exclude Testimony of Dr. Garrett Wood

Polaris moves to exclude the testimony of Plaintiffs' accident reconstructionist, Dr. Wood, in its entirety, arguing that his opinions are "either descriptions of the [UTV] or crash scene for which no expert testimony is required" or are "speculative." [See Docs. 116; 117].

The proponent of an expert's testimony must demonstrate that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R.

Evid. 702(a). "Although expert testimony is generally presumed helpful to the jury, . . . [Rule] 702 excludes expert testimony on matters within the common knowledge of jurors." Persinger v. Norfolk & W. Ry. Co., 920 F.2d 1185, 1188 (4th Cir. 1990). Additionally, "[a] reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation[.]" Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).

In his report, Dr. Wood states the following opinions:

1. As the [UTV] occupied by Mr. Ziegler approaches the incident area, there is a limited sight distance to oncoming traffic due to obstructions in a left-hand curve.

2. The eastern edge of Dark Ridge Road is bordered by a narrow shoulder, limiting the opportunity for vehicles exiting the paved surface to regain the roadway.

3. A restrained passenger with an intact occupant compartment would not be expected to strike the left side of their head in the evaluated sequence of events.

4. The [UTV]'s rollover protection system deformed as a result of this incident, intruding into the passenger occupant compartment.

5. The deformation of rollover protection system components and the [UTV]'s roof towards Mr. Ziegler allowed for the opportunity to strike the left side of his head.

[Doc. 117-2 at 22].

What Dr. Wood characterizes as his first, second, and fourth "opinions" merely describe the scene of the crash and the appearance of the UTV after the crash. There are several photographs in the record showing the damaged UTV, the scene of the crash, and the area around the scene. [Id. at 5-10, 13-16, 20]. Thus, to the extent that Dr. Wood's descriptions can be considered "opinions" under Rule 702, they will be excluded because the trier of fact will be able to form its own conclusions upon viewing these photographs. See United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995) ("the comparison of photographs is something that can sufficiently be done by the jury without help from an expert."). Nonetheless, this factual information could *potentially* be admitted under Rule 703 if it serves as a basis for Dr. Wood's third and fifth opinions, provided that these opinions are admissible under Rule 702.

Regarding Dr. Wood's third opinion, his report states that a surrogate occupant study, in which an individual of similar size to Mr. Ziegler was seated and observed in an undamaged exemplar UTV, demonstrated that there was "likely greater than 1.5 feet of standoff from Mr. Ziegler's head to the A-pillar and windshield header of" the UTV prior to the crash and that "[g]iven a restrained occupant, significant movement out of position would

not be expected." [Doc. 117-2 at 21]. Addressing the two pieces of this opinion separately, Dr. Wood could reliably measure the distance from the test subject's head to the undamaged ROPS of the exemplar UTV simply by using a ruler or tape measure. Thus, Dr. Wood may testify about conducting the surrogate occupant study and state the distance he measured from the test subject's head to the undamaged UTV's ROPS.

However, Dr. Wood does not demonstrate in his report that he performed any scientific or scholarly analysis in determining that a restrained occupant would not move significantly out of position during a crash. Rather, it appears that Dr. Wood merely assumed, based on common sense, that restraint systems, such as seatbelts, prevent occupants in a vehicle from moving significantly during a crash and thus, that an individual wearing a seatbelt would not move enough to strike their head on an object 1.5 feet away during a crash. This is the exact sort of "common sense inquiry" that the "untrained layman [is] qualified to determine intelligently . . . without enlightenment from those having specialized" training. See Fed. R. Evid. 702 advisory committee's note on proposed rule; see also Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986) ("Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors . . . ."). Moreover, Dr. Wood did no testing or

analysis of the seatbelt that the presumes restrained Mr. Ziegler.  As such, this is more in the nature of an assumption than a common sense inquiry, much less a scientific opinion.  Thus, the second portion of Dr. Wood's third opinion will be excluded because he did not demonstrate that it is based on any scientific or scholarly methodology and because it would be unhelpful to the trier of fact.  <u>See</u> Fed. R. Evid. 702(a).

With regard to Dr. Wood's fifth opinion, an expert's "speculat[ion] as to a possibility . . . lack[s] any probative value" and therefore, is inadmissible under Rule 702(a) because it is unhelpful.  <u>See</u> <u>Oglesby</u>, 190 F.3d at 251; <u>see</u> <u>also</u> <u>Rohrbough v. Wyeth Lab'ys., Inc.</u>, 241 F.2d 164, 972 (4th Cir. 1990) ("[A]n expert's opinion as to proximate cause must be stated in terms of reasonable probability."); <u>Textron Inc. <em>ex rel.</em> Homelite Div. v. Barber-Colman Co.</u>, 903 F. Supp. 1570, 1575 (W.D.N.C. 1995) ("[T]o guard against raw speculation[,]" the fact-finder should not consider an "expert opinion [t]hat suggests merely a possibility[.]").  Dr. Wood states that "[t]he deformation of rollover protection system components and the [UTV]'s roof towards Mr. Ziegler <em>allowed for the opportunity</em> to strike the left side of his head."  [Doc. 117-2 at 22 (emphasis added)].  When asked about this opinion during his deposition, however, Dr. Wood agreed that he does not "know whether [Mr.] Ziegler hit the left side of his head on the deformed ROPS" and that this is

merely "possible." [Doc. 138-1 at 291:18-292:7, 294:17-20]. He also stated that "we don't know enough specifics about the rollover in this case" to determine what caused Mr. Ziegler's injuries and agreed that it is equally likely that the left side of Mr. Ziegler's head struck the lightbar mounted on the rear of the UTV's ROPS during the crash, and that this may have caused his injuries. [Id. at 295:14-24, 296:21-297:1]. Put simply, Dr. Wood is merely speculating that given the deformation of the UTV's ROPS, it is possible that it struck Mr. Ziegler's head during the crash and thereby caused his injuries. This speculation is unhelpful. Therefore, Dr. Wood's fifth opinion will be excluded. See Fed. R. Evid. 702(a).

Returning to Dr. Wood's descriptions of the damaged UTV and the crash scene, to be admissible under Rule 703, this factual information must serve as a basis for Dr. Wood's admissible opinions. See Fed. R. Evid. 703. Here, only Dr. Wood's opinion regarding the distance measured between the test subject's head and the ROPS of the exemplar UTV during the surrogate occupancy study is admissible. Neither Dr. Wood's descriptions of the scene of the crash nor the *damaged* UTV's ROPS are at all related to Dr. Wood's measurement of the distance between the test subject's head and the *undamaged* exemplar UTV's ROPS during the surrogate occupancy study.

Thus, Dr. Wood's descriptions included in his report as opinions one, two, and four will be excluded.

For these reasons, Polaris's motion to exclude Dr. Wood's testimony is granted in part and denied in part.

### D. Polaris's Motion to Exclude Testimony of Dr. David Bosch

Polaris moves to exclude the testimony of Dr. Bosch, Plaintiffs' expert on industry standards, in its entirety, arguing that his testimony regarding rollover standards is irrelevant, that his opinions based on his interpretation of the OSHA 1928.53 standard are unhelpful, and that his opinions regarding alternative designs are not based on sufficient facts or data and are not held to a reasonable degree of certainty. [See Docs. 121; 123]. Polaris also more generally contends that Dr. Bosch's report does not demonstrate how he applied the facts of this case in coming to his conclusions. [Doc. 123 at 2].

An "expert witness' report must contain, among other things, 'a complete statement of all opinions the [expert] witness will express and the basis and reasons for them[.]'" Bresler v. Wilmington Tr. Co., 855 F.3d 178, 189 (4th Cir. 2017) (quoting Fed. R. Civ. P. 26). To satisfy this requirement, "[e]xpert reports must not be sketchy, vague or preliminary in nature and must include how and why the expert reached a particular result, not merely the expert's conclusory opinions." Id. at 210 (Wynn, J., concurring in part)

(quoting Salgado *ex rel.* Salgado v. Gen. Motors Corp., 150 F.3d 735, 741 n.6 (7th Cir. 1998)) (internal quotation marks omitted). An expert's opinions are inadmissible where his report "is devoid of any explanation regarding the methodology, analysis, or expert knowledge . . . used to reach his opinions." Bunting Graphics, Inc. v. Whiting-Turner Contracting Co., No. 19-cv-2323-LKG, 2022 WL 14664724, at *9 (D. Md. Oct. 25, 2022).

Dr. Bosch begins his analysis by stating the elements of different rollover protection standards, including the FMVSS standards, the ISO standard, the OSHA standard, and the SCORE standard, facts about these standards, facts about how testing is conducted under these standards, and his commentary about the adequacy of each standard. [Doc. 102-7 at 21-32]. He also later discusses the FMVSS standards in more detail. [Id. at 55-73]. However, "[a] design standard that does not . . . apply to the product at issue categorically lacks a valid scientific connection to the pertinent inquiry. It is, in simpler words, the touchstone of irrelevancy under Daubert." Sardis, 10 F.4th at 289 (citing Daubert, 509 U.S. at 592). Plaintiffs do not contend that the FMVSS standards, the ISO standard, or the SCORE standard apply to the UTV at issue in this case. [See Doc. 135]. Indeed, Dr. Bosch states in his report that the FMVSS standards apply to automobiles, that the ISO standard applies to earth-moving machinery, and that the SCORE standard

applies to off-road racing vehicles. [Doc. 102-7 at 21-29]. These standards are plainly irrelevant to the UTV at issue and thus, testimony based thereon would be unhelpful. Moreover, Dr. Bosch never explains how he applied these standards to the facts of this case. Therefore, Polaris's motion to exclude Dr. Bosch's testimony based on the FMVSS standards, the ISO standard, and the SCORE standard is granted.[9]

Dr. Bosch also states in his report that the UTV does not meet the OSHA 1928.53 standard, which the parties agree applies to the UTV. [Id. at 24; Docs. 123 at 11; 135 at 5]. However, expert testimony that merely states a legal conclusion is properly excluded as unhelpful. See United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002) (citing Woods v. Lecureux, 110 F.3d 1215, 1220 (6th Cir. 1997)) ("It is, therefore, apparent that testimony offering nothing more than a legal conclusion . . . is properly excluded under the Rules."). Dr. Bosch concedes that his conclusion that the UTV's ROPS did not meet the OSHA standard is based only on his interpretations of the standard's language and the decision in Spencer v. Honda Motor Corp. Ltd., No. 2:21-cv-00988-JAM-DMC, 2022 WL 14863071 (E.D. Cal. Oct. 26, 2022). [See Doc. 102-7 at 154:22-155:5]. As such, this opinion amounts only to an

_____

[9] This includes Dr. Bosch's testimony that Polaris designed the UTV's ROPS according to the "wrong" standard because it allegedly did not meet the requirements of these inapplicable standards.

unhelpful legal conclusion.  Additionally, while Dr. Bosch states in his report that the UTV did not meet the OSHA standard, he contradicts this in his deposition, stating that he has "no reason to believe that the relevant [ROPS] here didn't meet OSHA." [Id. at 160:25-161:2].  As a result, it is unclear what if any opinion Dr. Bosch holds regarding the UTV's compliance with the OSHA standard.  For both reasons, Polaris's motion to exclude Dr. Bosch's opinion regarding the UTV's compliance with the OSHA standard is granted.

Dr. Bosch's report also lists several alternative designs that he contends would "significantly improve" the crashworthiness of the UTV's ROPS, such as using structural foam,[10] higher strength steel, increasing the plastic modulus by increasing dimensions or adding reinforcement plates, using "X" bracing, increasing the dimensions of the ROPS tubing, etc. [Id. at 34-40].  However, an expert's testimony regarding the safety of alternative designs is properly excluded where it is "unsupported by any evidence such as test data or relevant literature in the field." See Nease, 848 F.3d at 234 (quoting Oglesby, 190 F.3d at 249).  Dr. Bosch admits that he has not conducted any testing on the designs he suggests, and his report does not explain how any of the information referenced therein establishes that these

---

[10] Plaintiffs represent that they are withdrawing Dr. Bosch's opinions relating to the foam alternative design.  [Doc. 135 at 15].

alternative designs would improve performance of the UTV's ROPS during a crash. [Doc. 102-7 at 123:1-4, 261:15-262:5]. Indeed, Dr. Bosch's report does no more than list most of these alternatives. [See id. at 34-36]. Accordingly, Plaintiffs have not met their burden of demonstrating that Dr. Bosch's alternative design testimony would be helpful to the jury, that it is based on sufficient facts or data, or that it is the product of reliable principles and methods.

Moreover, under North Carolina products liability law, a plaintiff must provide evidence that a proposed alternative design is "safer, practical, feasible, and otherwise reasonable"; that it "could then have been reasonably adopted"; and that it "would not have substantially impaired the usefulness, practicality, or desirability of the product." See Sparks v. Oxy-Health, LLC, 134 F. Supp. 3d 961, 987-88 (E.D.N.C. 2015) (quoting DeWitt v. Eveready Battery Co., 144 N.C. App. 143, 154, 550 S.E.2d 511, 518 (2001), aff'd, 355 N.C. 672, 565 S.E.2d 140 (2002)). Dr. Bosch's report does not discuss how his alternative designs would be incorporated in the UTV, nor whether they would be feasible. For all these reasons, Polaris's motion to exclude Dr. Bosch's alternative design testimony is granted.

More broadly, as the proponents of Dr. Bosch's testimony, Plaintiffs have the burden of demonstrating that "it is more likely than not" that his

testimony "will help the trier of fact to understand the evidence or to determine a fact in issue[,]" that it is "based on sufficient facts or data[,]" that it "is the product of reliable principles and methods[,]" and that it "reflects a reliable application of the principles and methods to the facts of the case." See Fed. R. Evid. 702. Dr. Bosch's analysis spans pages 21 through 75 of his report. [See Doc. 102-7 at 21-75]. Pages 21 through 32 contain facts about rollover protection standards that mostly do not apply to UTVs, as discussed above, pages 32 through 34 discuss general product engineering principles, pages 34 through 40 contain a list of ways that roll cage designs can be generally improved, as discussed above, pages 40 through 54 contain factual information about the history of automobile roof crush standards, pages 55 through 73 discuss the FMVSS standard that applies to automobiles, as discussed above, and pages 73 through 75 discuss testing that automobile companies have done on their vehicles' roofs in the past, as well as the results of this testing. [Id.].

While some of the information Dr. Bosch recites in his report could *potentially* support his conclusions, he never explains *how* these inapplicable standards, general principles, and historical information relate to this case. Indeed, he rarely mentions any of the facts of this case in his report's analysis, which appears to be largely boilerplate. Moreover, Dr. Bosch's

report does not explain his methodology, and he mentions almost all of his opinions for the very first time in his report's conclusion, without explanation. As a result, Plaintiffs have not demonstrated that Dr. Bosch's testimony meets any of the requirements of Rule 702.

Therefore, Polaris's motion to exclude Dr. Bosch's testimony is granted.

### E. Polaris's Motion to Exclude Testimony of Dr. Robert Burnham

Polaris moves to exclude the testimony of Dr. Burnham, Plaintiffs' mechanical engineering and "Finite Element Analysis" expert, in its entirety, arguing that Dr. Burnham has not complied with the requirements of Rule 26 of the Federal Rules of Civil Procedure. [See Docs. 124, 126 at 4].

An expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them," including "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). The phrase facts or data is to "be interpreted broadly to require disclosure of any material considered by the expert, from whatever source." Id. at advisory committee note to Rule 26(a)(2)(B). This material includes any information that an expert "generates, reviews, reflects upon, reads, and/or uses in connection with the formulation of his opinions, even if such information is ultimately rejected." Clean Mgmt. Envtl. Grp. v. Asymmetric

App. Grp., No. 2:19-00942-BHH, 2020 WL 4679351, at *4 (D.S.C. June 12, 2020). "The federal rules impose an 'automatic sanction' of exclusion of a party's expert witness for failure to adhere to the requirements set forth in Rule 26(a)." SSS Enters., Inc. v. Nova Petrol. Realty, LLC, 533 F. App'x 321, 324 (4th Cir. 2013); see also Campbell v. United States, 470 F. App'x 153, 156 (4th Cir. 2012) (affirming district court's exclusion of plaintiff's expert where expert's report did not contain the disclosures required by Rule 26(a)). However, this sanction may be avoided where the failure to comply with Rule 26(a) is harmless. See Fed. R. Civ. P. 37(c).

Dr. Burnham was hired by Plaintiffs to determine the direction and amount of force that was applied to the UTV's ROPS during the crash. [See Doc. 102-6 at 8]. However, rather than making his own determinations, Dr. Burnham contracted with a third-party vendor, Adapt Technologies ("Adapt"), to conduct computer simulations using different load cases[11] in order to select the load case that would result in deformation to a simulated ROPS "most like" that observed in the photos of the UTV's ROPS after the crash.[12] [Id. at 11; Docs. 126-4; 152 at 2]. Each of Dr. Burnham's opinions, which are

---

[11] A load case is defined by Dr. Burnham as being the combination of the amount and direction of a force, essentially a vector. [Doc. 133-1 at 5].

[12] Adapt conducted simulations using at least 23 different load cases. [See Doc. 152 at 2].

as follows, depend on the "data surrounding the incident," meaning the data generated by Adapt during its simulations:

### Opinion 1

Evident from the **data surrounding the incident** and the injuries suffered by Mr. Ziegler is that the ROPS design of the [UTV] was inadequate to protect belted-in passengers from a rollover incident that could be clearly foreseen, given the performance and intended use of the [UTV].

### Opinion 2

It was feasible for Polaris to design a ROPS for the [UTV] competent to withstand this foreseeable injury. This was verified through the analytical process described in the following paragraphs.

### Opinion 3

A directional cost estimate of the proof-of-concept design improvement for the [UTV] to make the ROPS system functional in protecting passengers in rollover shows such a solution to be economical, especially in consideration of the extremely positive safety benefit to be obtained and the cost in comparison to the retail pricing of the [UTV].

[Doc. 102-6 at 11-23 (emphasis added)].

"The wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed. R. Evid. 702." Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, at 729 (E.D.N.C. 2007).

> The purpose of expert testimony is to aid the fact-finder, through explanation of complicated or technical areas which require specialized knowledge and understanding. While this function undoubtedly can lead to the adoption or incorporation of the ideas, information, and analysis of others with expertise in the same field, it does not lead to the conclusion that an expert with a perhaps overlapping . . . area of expertise should be permitted to merely adopt and incorporate verbatim another's 'expert' opinion.

Id. (citing Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 614-15 (7th Cir. 2002)) (internal citation omitted); see also Funderburk v. S.C. Elec. & Gas Co., 395 F. Supp. 3d 695, 719 (D.S.C. 2019) ("[A]n expert may not 'be the mouthpiece' of another expert . . . because such an opinion would not indicate reliability."). Here, Dr. Burnham is seeking to be the "mouthpiece" of Adapt. Indeed, he contracted with Adapt to determine *exactly the same* information that Plaintiffs hired him to determine—the direction and amount of force the UTV's ROPS experienced during the crash. He then, apparently, adopted Adapt's opinion as his own without *any* further analysis. Indeed, Dr. Burnham's report does not so much as state that he reviewed all the data that Adapt generated during its simulations. Thus, Dr. Burnham's opinions will be excluded because Plaintiffs have not demonstrated that they meet the reliability threshold of Rule 702.

Additionally, even if Dr. Burnham reviewed all the data generated by Adapt, that this data forms the basis of his opinions, and that he performed

some additional analysis, after he approved of the load case that Adapt selected, Adapt "deleted the data of the load cases that had been rejected" before it was provided to Polaris. [Doc. 133-1 at 5]. If Dr. Burnham reviewed this data, and it forms the basis of his expert opinions in this matter, it constitutes facts or data under Rule 26 which Dr. Burnham was required to disclose to Polaris. See Clean Mgmt. Envtl. Grp., 2020 WL 4679351, at *4. By allowing this data to be deleted, Dr. Burnham has failed to comply with the requirements of Rule 26.

Plaintiffs do not argue that this failure is harmless error. [See Doc. 139]. However, to the extent that this issue is before the Court, Polaris has established that it has been prejudiced by Dr. Burnham's noncompliance with Rule 26 because each of his opinions depend on Adapt's data. Indeed, his report states that opinions one and two are based upon the data Adapt generated, and opinion three—that the alternative design tested by Adapt is economically feasible—is irrelevant absent data demonstrating that this design would perform better in a crash. [See Doc. 102-6 at 11-17]. Additionally, because Dr. Burnham failed to provide Polaris with the data relating to the 22 load cases Adapt rejected, Polaris cannot properly question Dr. Burnham about how and why the one load case was selected, cannot examine the data relating to the other load cases to determine if they more

accurately reflect the deformation sustained by the UTV's ROPS during the crash, and cannot analyze the total volume of data to discern any relevant trends. Accordingly, even if Dr. Burnham had reviewed all of Adapt's data and this data forms the basis of his opinions, his testimony would still be excluded.[13] SSS Enters., Inc., 533 F. App'x at 324.

For these reasons, Polaris's motion to exclude Dr. Burnham's testimony is granted.

### F. Plaintiffs' Motion in Limine to Bar Mission Hospital Toxicology Results / Plaintiffs' Motion to Exclude Testimony of Dr. Randall Tackett

Plaintiffs seek to bar admission of Mission Hospital's toxicology test results that state Mr. Ziegler's and Kipp's blood alcohol content after the crash, arguing that the reports of these results state in a footnote that "[p]ositive results have not been verified by a second confirmatory procedure. Unconfirmed results should not be used for nonmedical purposes." [Docs. 127-1 at 2; 127-2 at 3]. Plaintiffs also seek to exclude the

---

[13] Plaintiffs contend that the data relating to the 22 load cases that Adapt rejected are protected from disclosure under Rule 26(b)(4)(B) as drafts of Dr. Burnham's work. [See Doc. 139 at 8]. However, raw data itself does not amount to a draft of an expert's report. See Immunex Corp. v. Sanofi, No. 17-2613-SJO, 2018 WL 1941714, at *5 (C.D. Cal. Feb. 27, 2018) ("Contrary to defendants' position, this raw data from the . . . [e]xperiments does not qualify as 'draft expert reports.'"). Moreover, even if raw data *could* be considered a draft of an expert report, the data relating to the load cases that Adapt rejected cannot be so considered because Dr. Burnham did not perform this testing. Indeed, there is no indication that he ever saw this data.

testimony of Dr. Tackett, Polaris's toxicology expert, because he relied on these test results despite the footnotes.  [Doc. 127 at 1-7].

"The results of an otherwise reliable medical procedure are [not] rendered inadmissible simply because a hospital says [in a footnote] that the results should not be used in legal proceedings."  O'Neill v. Windshire-Copeland Assocs., 327 F.3d 281, 286 (4th Cir. 2004); Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731, 744 (W.D. Va. 2004) ("Simply because the medical record . . . contains a disclaimer [that it should not be used for 'legal purposes'], however, does not mean that the underlying data is unreliable."); see also Thomas v. Hogan, 308 F.2d 355, 361 (4th Cir. 1962) ("There is good reason to treat a hospital record as trustworthy.  Human life will often depend upon the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks.  To this extent at least, hospital records are deserving of a presumption of accuracy . . . .").

Plaintiffs' only argument for excluding the blood alcohol content test results, and therefore Dr. Tackett's testimony relying thereon, is that Mission Hospital's reports each contain the footnote quoted above.  However, the mere presence of disclaimers in these footnotes does nothing to demonstrate that the data contained in the reports is inaccurate or unreliable.

See O'Neill, 327 F.3d at 286.[14]  Accordingly, Plaintiffs' motion in limine to exclude the test results is denied.  Likewise, because Plaintiffs have not established that Dr. Tackett unreasonably relied on the results contained in these reports, their motion to exclude his testimony is also denied.

### G.    Plaintiffs' Motion to Exclude Testimony of Mark Warner

When Mr. Warner examined the scene of the crash three years after it occurred, on November 22, 2022, he observed and photographed a tree with broken branches.  [Doc. 114-2 at 22-23].  Plaintiffs move to exclude his testimony regarding when these branches broke, arguing that it is outside of his expertise in accident reconstruction.  [Doc. 114 at 2].

A witness may only provide expert opinion testimony to the extent his testimony is based upon his knowledge, skill, experience, training, and education.  See Fed. R. Evid. 702.  "An expert may base an opinion on facts . . . that the expert . . . personally observed."  Fed. R. Evid. 703. Accident reconstructionists, specifically, often base their opinions on information observed and collected from accident scenes.  See Callahan v. Pac. Cycle, Inc., 756 F. App'x 216, 224 n.4 (4th Cir. 2018) ("[A]n 'accident

---

[14] Additionally, medical records of regularly recorded activities are admissible unless the party challenging its admission shows its "lack of trustworthiness" based on "the source of [the] information or the method or circumstances of [its] preparation."  See Fed. R. Evid. 803(6)(E).  Plaintiffs have not at all explained how the disclaimers in these reports undermine the source of the test results, nor the methodology by which the results were determined.

reconstructionist' would determine how an accident occurred by measuring 'skid marks and tire tracks' at the scene of the accident.'"); State v. Denton, 265 N.C. App. 632, 636, 829 S.E.2d 674, 678 (2019). Experts may also testify to the factual assumptions underlying their conclusions, so long as these assumptions are supported by the evidence. See Sparks v. Gilley Trucking Co., Inc., 992 F.2d 50, 54 (4th Cir. 1993) (citing E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc., 795 F.2d 329, 337-38 (4th Cir. 1986)).

In his report, Mr. Warner opines that "[a]fter the [UTV] left the roadway and travelled airborne toward the riverbed, it passed through some trees overhanging the river. One of these trees was impacted by the [UTV] and was broken off by the rear bed of the [UTV]." [Doc. 114-2 at 22]. Mr. Warner bases this opinion, in part, on the fact that he observed a tree with broken branches at the crash scene on November 22, 2022. [Id. at 22-23]. As Rule 703 allows experts to base their opinions on facts that they personally observe, Mr. Warner may testify that he observed a tree with broken branches at the crash scene. Additionally, as there is evidence that the tree is located within the path the UTV travelled during the crash, and its branches were observed broken after the crash, Mr. Warner may testify about his factual assumption that the branches were broken during the crash. See Sparks, 992 F.2d at 54; [see also Doc. 148-1 at 6:5-7].

During his deposition, however, Mr. Warner goes further than this, offering opinions that the break pattern of the tree in question looked "consistent with about two or three years of healing" and that the age of certain portions of the tree might account for why they either broke or did not break upon impact with the UTV. [Doc. 148-1: Warner Dep. at 23-24; Doc. 114 at 3-4].[15] As foundation for these opinions, Mr. Warner testified that "analyzing damage to vegetation" "comes into play frequently" when reconstructing accidents and that he has been "involved" in a colleague's "thesis work on tree fracture energy." [Doc. 148-1 at 12:9-21].

Mr. Warner does not indicate in his report or deposition testimony what he meant, however, when he testified that accident reconstruction frequently involves "analyzing damage to vegetation." He fails to explain how often he analyzes vegetation, what training he has in analyzing vegetation, and what he typically analyzes vegetation to determine.[16] Similarly, while Mr. Warner

---

[15] The Court has cited Plaintiffs' motion for Mr. Warner's opinion that the age of certain portions of the tree could explain why they either broke or did not break upon impact with the UTV because Plaintiffs' "Exhibit 3," which purports to be excerpts of Mr. Warner's deposition, was not attached to Plaintiffs' filing. [See Doc. 114-3]. However, Plaintiffs' motion appears to quote the relevant part of Mr. Warner's deposition verbatim, and Polaris does not challenge the accuracy of Plaintiffs' quotes.

[16] While it is obvious that accident reconstruction might involve examining an accident scene for damaged vegetation to help determine the trajectory of a crash, it does not follow that accident reconstructionists are qualified to determine the age of vegetation based on its appearance or that they are qualified to determine when vegetation was damaged based on its healing.

states that he has been "involved" in a colleague's "thesis work on tree fracture energy," he does not identify this colleague, provide copies of this work, nor explain his involvement in this research. Mr. Warner also explains neither the phrase "tree facture energy," nor how this concept applies to his work as an accident reconstructionist. Rather, Mr. Warner plainly states in his deposition, "I don't have specific expertise in analyzing broken tree branches." [Id. at 5:12]. Thus, Mr. Warner's opinions about the tree's healing and age based on its appearance are outside his established area of expertise and will be excluded.

Accordingly, Plaintiffs' motion to exclude Mr. Warner's testimony is granted in part and denied in part. Specifically, Mr. Warner will be allowed to testify to observing the broken tree branches and to his assumption that they were broken during the crash. He will be precluded, however, from testifying that the tree's healing indicated that its branches were broken two to three years prior to his observations and that the age of certain portions of the tree explains why they either broke or did not break upon impact with the UTV.

## ORDER

**IT IS THEREFORE ORDERED** that:

(1) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Jerry Bauer [Doc. 109] is **GRANTED IN PART** and **DENIED IN PART**;

(2) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Stan V. Smith [Doc. 113] is **GRANTED**;

(3) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. Garrett Wood [Doc. 116] is **GRANTED IN PART** and **DENIED IN PART**;

(4) Plaintiffs' Motion in Limine to Bar Mission Hospital Toxicology Results [Doc. 119] is **DENIED**;

(5) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Dr. David Bosch [Doc. 121] is **GRANTED**;

(6) Polaris's Motion to Strike Plaintiffs' Retained Testifying Expert Robert E. Burnham [Doc. 124] is **GRANTED**;

(7) Plaintiffs' Amended Motion in Limine to Bar Tackett Testimony [Doc. 120, as corrected, Doc. 127] is **DENIED**; and

(8) Plaintiffs' Amended Motion in Limine to Bar Warner Testimony [Doc. 114, as corrected, Doc. 128] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

Signed: February 7, 2024

Martin Reidinger
Chief United States District Judge